Criminal Case Template






COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



JOHN BRANDON BENNETT,

                            Appellant,

v.

THE STATE OF TEXAS,

                            Appellee.

§

§

§

§

§

No. 08-05-00013-CR

Appeal from the

203rd District Court

of Dallas County, Texas

(TC# F-0358932-KP)




O P I N I O N

            This is an appeal from a jury conviction for the offense of murder. The jury assessed
punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal
Justice. We affirm the judgment of the trial court.
I. SUMMARY OF THE EVIDENCE
            Ron Byrd testified that on December 27, 2003, at approximately 9 p.m., he went to Ronnie’s
Catfish to pick up an order that he had called in. Six or seven customers were in the restaurant when
he entered, and the deceased, Alton Sloan, was working behind the cash register that evening. Byrd
chatted with the decedent and then sat between ten and twelve feet from the cash register awaiting
his order. Byrd noticed a young man wearing a cap and a leather jacket standing two or three feet
behind Sloan. He then saw the decedent take money out of the cast register drawer and put it in a
sack. The decedent gave Appellant the bag, and a struggle ensued. They “went back and forth” for
a couple of seconds and then a shot was fired. After the gun went off, the struggle continued, but
Byrd fled the restaurant. As he was leaving, he saw a man in a red shirt. Byrd stated that the man
in the red shirt could not have fired the weapon because he was behind Byrd when he heard the
gunshot. While outside, Byrd saw Appellant and the man in the red shirt leave the restaurant. Byrd
called 911, and ran to a 7-Eleven to retrieve a police officer. Byrd gave the police a description of
Appellant and later identified him in a photographic lineup as the man who shot the decedent. Byrd
identified Appellant in open court and testified that he was 100 percent certain that Appellant was
the man he saw shoot Sloan.
            Deshyne Williams, a thirteen-year-old boy, testified that he was working at Ronnie’s Catfish
on the night of the murder. Williams saw the deceased put money from the cash register into a bag. 
The deceased smiled at Williams and then pushed Appellant, who was behind him. A fight ensued. 
Williams heard a gunshot, but the fighting continued. Williams hopped over the restaurant counter
and ran. A man in a red shirt stopped him, pointed a gun at him, and told him to “freeze.” Williams
ran around the man and out the door. He stayed outside until he saw Appellant and the man in the
red shirt leave the restaurant. When Williams went back inside the restaurant, he saw the deceased
sweating and struggling to breath. He had blood on his shirt. He identified Appellant in court as the
man who was struggling with the deceased. Williams also testified that prior to the robbery and
subsequent shooting, Appellant had ordered food from him. Williams said that Appellant was
wearing a hat and a black leather coat. At the time Appellant placed his food order with Williams,
they were only a counter-width apart and Williams had no trouble seeing Appellant’s face.
            Ethel Davis testified that she knew Appellant and Tyrone Johnson. Prior to the murder, she
saw them at her house with her nephew, Mark Quinn. She was about to leave to go to the store when
she witnessed Appellant and Johnson leave out the front door with some “bags and stuff.” She had
known Appellant for about two years. After Appellant and Johnson left, Quinn attempted to stop
Davis from leaving the house, but she left anyway. She was headed to a 7-Eleven which coincidently
was across the way from Ronnie’s Catfish. Prior to reaching the convenience store, Davis saw
Appellant and Johnson run out of Ronnie’s Catfish. Johnson was carrying two guns, and Appellant
was carrying a sack. When they reached her, she asked them what they had done, but they said
nothing and went through a fence. Davis testified that Appellant was wearing a black leather coat
and Johnson was wearing a red, hooded sweater. Appellant was bleeding and looked as though he
had been in a fight. Davis later directed police to the house where Johnson was arrested.
            Johnette Sampson testified that on December 27, 2003, she was living in a residence with
Frederick Johnson, his younger brother, Tyrone Johnson, and Kathy Johnson, Frederick and Tyrone’s
mother. In the evening of the 27th, Tyrone and a man named John, who she later identified as being
the Appellant, came to the residence. Sampson stated that Tyrone had a bruise under his eye and
John appeared to be in shock and had difficulty standing up. Tyrone told the others that he and
Appellant had been jumped by some older men. Upon further questioning by Frederick, Tyrone
stated that his “home-boy” John had “already handled it.”
            The witness stated that she and the others present were dubious about his account of events
and she and Frederick and Kathy Johnson walked to the store to check out Tyrone’s story. At the
crime scene, they learned of the robbery and shooting and they returned home. When they arrived
at the residence, the police had already arrived and Tyrone was arrested at the door of the residence. 
The police walked through the house, but no arrests were made and no weapons were seized. After
the police left the residence, a black 9-millimeter pistol was found on the floor. Sampson testified
that after the pistol was found, she spoke later with Tyrone who stated that, “John shot the man” with
a “nine” and “that’s all you need to know.” Sampson was shown a photographic array and she
identified Appellant.
            Katherine Johnson, the mother of Tyrone and Frederick, testified that on the night of the
shooting, Tyrone returned home at about 9 p.m, with a man named John who she identified as
Appellant. Tyrone stated that they had been jumped by some older guys at the store. The witness
stated that Tyrone had a bruise near his eye and John appeared to be in shock. She disbelieved this
story and she, along with Frederick and Johnette Sampson, walked to the location where they learned
about the shooting. They returned to the residence. The police had already arrived. The police
arrested Tyrone near the front of the house. After the police left, Johnson discovered a pistol on the
floor of the residence. She called the police. She then saw Appellant leaving the house.
            Crime scene Detective Roosevelt Holiday found a bullet at the scene of the crime but was
unable to find any readable fingerprints. Upon learning there was a weapon in Tyrone Johnson’s
house, Dallas Police Officer Charles Moreland searched Tyrone Johnson’s house and found a 9-millimeter gun. Firearm and toolmark examiner Charles Clow testified that although he was unable
to match the bullet found at the restaurant to the gun found in Johnson’s house, it was possible that
the bullet was fired through the gun. A trace evidence examiner, Vicki Hall, testified that no gunshot
residue was found on the decedent’s hands. Keith Pinckard, the medical examiner who performed
the autopsy on the deceased, stated that Sloan died as a result of an abdominal pelvic gunshot wound. 
            At the defense portion of the trial, Napoleon McDonald, Appellant’s father, testified that he
owns a mechanic shop in which he employed Appellant on a full-time basis. McDonald testified that
on the day of the shooting, Appellant worked a full day and left between five-thirty and six that
evening. McDonald did not see Appellant again that day. McDonald testified that Appellant had
not recently owned a black coat. He stated that he did not know Appellant’s whereabouts at 9 p.m.
on the night of the shooting.
            Appellant’s sister, Tameka Estell, testified that she saw Appellant at their parent’s house on
the night of the murder and that she and Appellant left the house together between 8 to 8:15 p.m. and
went to a liquor store. According to Estell, they drove to her house where they spent the remainder
of the evening. He played with her children and Estell took Appellant home at about twelve or one
o’clock.
II. DISCUSSION
            In Issue No. Two, Appellant contends that the in-court identification of the Appellant by Ron
Byrd constituted a denial of due process of law in light of the impermissibly suggestive photographic
array that was used by the police. The court held a suppression hearing to determine the
admissibility of some of the witnesses’ in-court identifications. At the close of the hearing, the court
overruled the motion to suppress the identifications and held that they would be admissible. On
appeal, Appellant maintains that the in-court identification was inadmissible because four of the six
photographs in the array depicted men older than the description of Appellant that Byrd gave to the
police. Also, he hesitated when he identified Appellant, and he only saw Appellant for a short time
during the incident.
            A pretrial identification procedure may be so suggestive and conducive to mistaken
identification that subsequent use of that identification at trial would deny the accused due process
of law. Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971 (1968); Barley v. State, 906
S.W.2d 27, 32-33 (Tex.Crim.App. 1995). A court should conduct a two-step analysis to determine
the admissibility of an in-court identification and ask (1) whether the pretrial identification procedure
was impermissibly suggestive and, if so, (2) whether the suggestive procedure created a very
substantial likelihood of irreparable misidentification. Simmons, 390 U.S. at 384, 88 S.Ct. at 971;
Barley, 906 S.W.2d at 33. A defendant bears the burden of establishing by clear and convincing
evidence that the pretrial identification procedure was impermissibly suggestive. Barley, 906
S.W.2d at 33-34. A court must examine the totality of the circumstances surrounding the
identification. Id. at 33.
            If a court finds that a pretrial identification procedure was impermissibly suggestive, it must
then consider the factors enumerated in Neil v. Biggers to determine whether the suggestive
procedure gave rise to a substantial likelihood of irreparable misidentification. Neil v. Biggers, 409
U.S. 188, 199-200, 93 S.Ct. 375, 382 (1972). These non-exclusive factors are (1) the witness’s
opportunity to view the criminal, (2) the witness’s degree of attention, (3) the accuracy of the
witness’s description of the suspect, (4) the level of certainty at the time of confrontation, and (5)
the time between the crime and confrontation. Id. These five factors are treated as issues of fact and
are viewed in the light most favorable to the trial court’s ruling. Ibarra v. State, 11 S.W.3d 189,
195-96 (Tex.Crim.App. 1999). The five factors are then reviewed de novo against “‘the corrupting
effect’” of the suggestive pretrial identification procedure. Id.; Loserth v. State, 963 S.W.2d 770,
773-74 (Tex.Crim.App. 1998).
            A lineup is considered unduly suggestive if other participants are greatly dissimilar in
appearance from the suspect. Withers v. State, 902 S.W.2d 122, 125 (Tex.App.--Houston [1st Dist.]
1995, pet. ref’d). Thus, a lineup is suggestive when the accused is placed with persons of distinctly
different appearance, race, hair color, height, or age. Id. Minor discrepancies between lineup
participants will not render a lineup unduly suggestive. Partin v. State, 635 S.W.2d 923, 926
(Tex.App.--Fort Worth 1982, pet. ref’d). Neither due process nor common sense requires
participants in a lineup to be identical. Buxton v. State, 699 S.W.2d 212, 216 (Tex.Crim.App. 1985). 
The courts also allow great latitude concerning the age disparity among lineup participants. Latson
v. State, 713 S.W.2d 137, 140 (Tex.App.--Houston [1st Dist.] 1986, pet. ref’d) (eighteen-year
discrepancy between lineup participants not unduly suggestive).
            On the night of the shooting, Byrd provided the police a description of the shooter indicating
that he was a young man anywhere between twenty-one and thirty years old, unshaved, wearing a
cap and a black leather jacket. Byrd was shown the photographic array in question, and picked out
Appellant as the shooter. Byrd also signed his name on the back of the photograph. Byrd testified
at the hearing that when he was shown the photographic array, he did not notice any significant age
difference until the suppression hearing. Then he stated, “Today I can see that.” Byrd stated he did
not eliminate anyone because of age; rather, he stated that, “I just chose who I saw.”
            An examination of the photographic array does not show any great age disparity outside of
the stated range of between twenty-one and thirty years of age. We find that the age of the
individuals in the photographic array did not cause the identification to be impermissibly suggestive. 
            Appellant also contends that Byrd admitted that he hesitated for an extended period of time
when he identified Appellant at the suppression hearing. However, Byrd responded that he was
trying to focus. Further, Byrd stated that he picked the photograph of Appellant because he was the
man who shot the deceased, and that he was 100 percent sure that Appellant was the shooter.
            Appellant also argues that Byrd only saw Appellant for a short time. However, the record
demonstrates that the witness observed Appellant from a distance of ten to twelve feet from the time
he stood behind the deceased to the time Appellant left the restaurant. Byrd was able to observe the
entire struggle and provide a description of that struggle. The photographic lineup was shown to
Byrd only two days after the murder. We find that the identification procedure was not
impermissibly suggestive. Issue No. Two is overruled.
            In Issue No. Three, Appellant argues that the court erred in failing to suppress the in-court
identification testimony of Johnette Sampson because it was irreparably tainted by impermissibly
suggestive identification procedures utilized by the police. First, Appellant argues that Sampson did
not have an opportunity to view Appellant. Appellant also argues that because Sampson knew
Katherine Johnson had identified someone in the lineup, her identification was tainted. Finally,
Appellant reasserts his argument that four men in the line-up appeared older than Appellant,
rendering the identification procedure impermissible suggestive.
            During the pretrial suppression hearing, Sampson testified that on the night of the shooting,
she saw a man named John who was with Tyrone Johnson. Sampson had never met the man before
and did not carry on any meaningful conversation with him. She gave a description to the police
indicating the man was wearing blue pants; she did not provide the police with an age, height, or
weight description. However, she testified that she was with Appellant for approximately ten to
fifteen minutes, and she had the opportunity to observe his face. She testified that she saw him
outside and inside the house and that she looked at him closely. The description, while vague, was
not shown to be inaccurate, and the witness had enough time to observe Appellant.
            Sampson also testified that several days after the shooting, several detectives came to her
house where she and the others were shown a photographic array. Sampson said they were shown
the array individually and Kathy Johnson was shown the array first. Sampson testified she was
aware Johnson had picked out one of the photographs, but she did not know which one. Further, she
testified that she picked out Appellant because he was the man she saw that night. Next, Sampson
was shown the array and she picked out Appellant’s photograph. When Sampson turned the photo
over to sign the back, she saw the signature of Johnson, but not that of Byrd. The mere fact that an
individual knows that a suspect has been picked out of a lineup does not render the lineup
impermissibly suggestive because a complaining witness normally assumes that a lineup includes
a suspect. Harris v. State, 827 S.W.2d 949, 959 (Tex.Crim.App. 1992), cert. denied, 506 U.S. 942,
113 S.Ct. 381, 121 L.Ed.2d 292 (1992); Webb v. State, 760 S.W.2d 263, 270-73 (Tex.Crim.App.
1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989); Johnson v. State, 901
S.W.2d 525, 534 (Tex.App.--El Paso 1995, pet. ref’d).
            We have already addressed the age contention, and we note that there is nothing in
Sampson’s testimony that indicates that age was a factor in her identification. Issue No. Three is
overruled.
            In Issue No. Four, Appellant asserts that the court erred in failing to suppress the in-court
identification testimony of Katherine Johnson because it was tainted by an impermissibly suggestive
photographic array. Appellant argues Johnson’s in-court identification was tainted because four out
of the six photographs in the lineup depicted men older than the description of Appellant. Appellant
also notes that Johnson indicated to police that Appellant was wearing a blue shirt and only
Appellant and one other person in the line-up were wearing blue shirts. Appellant further argues that
the inability of Johnson to give the police a physical description of Appellant was evidence of a
tainted identification.
            During the suppression hearing, Katherine Johnson testified that she first met Appellant on
the night of the shooting. She later described the man to the police as being a “brown skinned man”
wearing a blue shirt. Johnson, however, did not provide the police with an age description or a
height and weight description. Two days later, Johnson was shown a photo line-up by the police. 
Johnson was shown the array before it was shown to Sampson and then to her son Frederick. 
Johnson picked out Appellant’s photograph.
            We have already held that the difference in the ages of the suspects in the photo line-up was
not impermissibly suggestive and restate the same with regard to the witness Katherine Johnson.
            With respect to the issue of the blue shirts, Johnson acknowledged under oath that four of
the men in the lineup were not wearing blue shirts. However, she also testified that she did not pick
out Appellant because of the shirt he was wearing. Defense counsel asked, “Because you knew you
were looking for somebody in a blue shirt, right?” Johnson answered, “No, I was looking for the
person I seen the face. By me knowing that he got a blue shirt it might not be the man. I have to
know his face, I can’t say because he have on a blue shirt because anybody can wear blue.” Johnson
specifically stated that she picked Appellant because he was the man she saw on the night of the
murder and not because of the color of his shirt.
            Although the description of a “brown skinned man wearing a blue shirt” is not a precise
physical description, it does not render her description inaccurate. Also, given her testimony that
she did not select Appellant’s picture on the basis of shirt color, we find it has little bearing on the
identification. We find that the court did not err in denying Appellant’s motion to suppress the in-court identification. Issue No. Four is overruled.
            In Issue No. One, Appellant claims the evidence is factually insufficient to support the
conviction. In conducting a factual sufficiency review, we view the evidence in a neutral light to
determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. We set
aside the fact finder’s verdict only if (1) the evidence supporting the verdict, when considered by
itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) evidence contrary
to the verdict is strong enough that the beyond-a-reasonable-doubt standard could not have been met. 
Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex.Crim.App. 2004). However, our factual sufficiency
review must be appropriately deferential so as to avoid substituting our judgment for that of the fact
finder. Clewis v. State, 922 S.W.2d 126, 133 (Tex.Crim.App. 1996). Accordingly, we are
authorized to set aside the jury’s finding of fact only in instances where it is manifestly unjust,
shocks the conscience, or clearly demonstrates bias. Id. at 135. If the evidence is factually
insufficient, we remand to the trial court for a new trial. Id. at 133-35.
            At trial, five independent witnesses identified Appellant. First, Ron Byrd identified
Appellant as the shooter. Deshyne Williams identified Appellant as the man who robbed the
restaurant and fought with Alton Sloan at the time he was shot. Williams said Appellant was
wearing a black leather jacket and that the man who pointed a gun at him as he exited the restaurant
was wearing a red shirt. Ethel Davis testified that she saw Tyrone Johnson and Appellant running
from Ronnie’s Catfish restaurant. Johnson was holding two guns and Appellant was holding a bag. 
She also testified that Appellant was wearing a black leather coat and Johnson was wearing red. 
Katherine Johnson and Johnette Sampson testified that they saw Appellant and Tyrone Johnson after
the shooting and that Appellant appeared to be in shock. Tyrone told Sampson that Appellant shot
a man with a 9-millimeter gun, and a 9-millimeter gun was found later at his house. The firearm and
toolmark examiner testified that although he was unable to match the bullet found at the restaurant
to the gun found in Johnson’s house, it was possible that the bullet was fired through the gun.
            Appellant reasserts his arguments about the admissibility of the in-court identifications of
Byrd, Sampson, and Johnson. However, we have found above that the admission of the
identification testimony of the latter three witnesses was not erroneous and we do not find their
identifications to be unreliable.
            In addition, Appellant argues the testimony of Williams was unreliable because of Williams’s
testimony that when the deceased was putting the money into the bag, he “didn’t pay no attention”
to the other man and that he did not realize something was wrong until they were in the corner
fighting. Appellant also argues that Williams’s view of the struggle was partially obstructed by the
deceased who was a large man. Although Williams did not pay attention to Appellant until after the
fight ensued and his view was partially obstructed, he was still able to identify Appellant with
certainty.
            Appellant argues that the weight of Williams’s testimony must be discounted also because
there was testimony from police witnesses that Williams was traumatized and “disoriented” after the
shooting. Williams admitted under oath that he was nervous during the struggle. Naturally, one
would expect a twelve-year-old boy who had just witnessed a fight and subsequent shooting of a man
to be upset or traumatized. However, the record shows that prior to the fight, Appellant had placed
a food order with Williams. At the time Appellant placed his food order with Williams, they were
only a counter-width apart and Williams had no trouble seeing Appellant’s face. Further, Williams
testified that he had no doubt in his mind that Appellant was the man who robbed the restaurant and
fought with Alton Sloan.
            Next, Appellant argues that Ethel Davis’s, Johnette Sampson’s, and Katherine Johnson’s
testimony is unreliable because they lied to get better treatment for or to protect Tyrone Johnson. 
The record shows that Sampson was Tyrone’s brother Frederick’s girlfriend, and Katherine Johnson
was Tyrone’s mother. It was established that Davis knew Tyrone. However, she stated that she had
not known him very long. Davis also directed police to the house where Johnson was arrested.
            We note that there is no evidence in the record to support Appellant’s contention that the
three lied to protect Tyrone. Further, it is illogical to believe that they would perjure themselves to
protect Tyrone in light of the fact that each testimony also implicated him in the instant offense.
            Appellant offered the alibi testimony of his sister Tameka Estell, and argues that her
testimony is sufficient to prove that he was not at the restaurant at the time of the murder, and was
thus misidentified or falsely accused of the murder. However, there is an abundance of evidence to
the contrary. Also, the credibility of witnesses is not an issue for the appellate court, but one for the
jury. The jury as the sole trier of fact was free to disbelieve any of the testimony including that of
Estell. We do not find that the evidence contrary to the verdict is strong enough that the
beyond-a-reasonable-doubt standard could not have been met. Issue No. One is overruled.
            Having overruled each of Appellant’s issues on review, we affirm the judgment of the trial
court.
                                                                        ANN CRAWFORD McCLURE, Justice

September 21, 2006

Before Barajas, C.J., McClure, and Chew, JJ.
Barajas, C.J., not participating

(Do Not Publish)